And our next case is Lewis v. AbbVie. Mr. Heyman, whenever you're ready. Good morning. Good morning. May it please the Court. My name is Peter Heyman. I represent the appellant, Jeffrey Lewis, in this matter. This is an employment retaliation claim that is up on appeal after the grant of a motion to dismiss. The claim falls under the False Claims Act. Mr. Lewis was a sales rep for a drug company who worked in northwest Indiana. At the time he worked there, one of the drugs he sold was a drug called Vraylar. At the time, Vraylar was approved for the treatment of depressive episodes and bipolar I. It was not approved for treatment for major depressive disorder, which is a much larger market. It was a market that AbbVie desperately wanted to get into to increase its sales numbers. During the time he worked at AbbVie, employees, including himself and everyone there, got routine training on FDA regulations with regards to off-label marketing of prescription drugs. They were instructed that violations of these regulations constituted a litigation risk under state and federal anti-fraud statutes. The company trainings connected those dots for him. Mr. Lewis took those trainings seriously, and he abided by the compliance regulations that he was instructed on. Despite that, he was also routinely and repeatedly instructed, go ahead and sell it off-label, sell it as hard as you can to get this into the SSRI market for major depressive disorder. Now that would have been a regulatory violation for the company, am I right? Absolutely. And not just an uncontextualized regulatory violation. As alleged in the complaint, that is a regulatory violation which constitutes a fraud risk for civil and criminal anti-fraud statutes. You say fraud risk. Correct. But what do you mean by fraud risk? The reason it is a fraud risk is because of the fact that that off-label marketing will generate false claims being submitted to government health care programs. As a rule, government health care programs do not pay for off-label uses for prescription drugs. Was there any, is there any allegation that the company ever induced, encouraged its sales representatives, including your client, to encourage the filing of an off-label, of an off-label claim? There is not a specific allegation that AbbVie or its employees instructed doctors to submit claims for reimbursements after they wrote off-label prescriptions. Is there anything wrong with a physician filing a claim as long as, not filing it for his patient, as long as he does indicate that it is an off-label prescription? I am not familiar with the particular regulation for the doctor itself. What is at issue here is what is AbbVie's sales conduct as it relates to these doctors. And so insofar as it induces doctors to prescribe this for off-label uses, and then those doctors in turn submit those claims to government health care programs, a false claim will result. Well, all the time? It would result in an appreciable majority of cases. If the doctor says this is off-label and the claim is filed, it's a fraudulent claim, is that your position? I am not taking that position. If it is possible that the doctor adequately discloses off-label prescription and the claim is either denied or is not paid, then a false claim would not result. And in fact, there are such instances, are there not? There are. Yes. And so the company is not at any point telling the doctor to file a false claim or to lie about it being off-label. Am I right? Liability under the False Claims Act under Section 3729 applies to conduct which either knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. Cases involving off-label marketing by drug companies have routinely resulted in liability under federal anti-fraud statutes, specifically this statute. Liability for whom? I'm sorry? Liability for whom? For the drug company. Even though the drug company is not the entity that ultimately submits the false claim, its sales practices in promoting this off-label use have a tendency to cause false claims for the portion of recipients who are on government health care. And your representation is that, in fact, companies are held liable under the False Claims Act. AbbVie and Abbott Laboratories paid $1.6 billion for that exact practice for the sale of the drug Depakote. There are multiple cases cited in the brief where that, as a theory, this practice can cause liability. That is exactly the training that employees were given by AbbVie. We are not allowed to do this. AbbVie was at least taking a chance. There's no question about it. Absolutely. But how does that help your clients? They were taking a chance. Their conduct was a plan of conduct which had the intended effect of increasing the prescription for off-label uses, which are per se not reimbursable. And that's particularly true in the case of Tricare, which would be for the VA. Even if a doctor wanted to write whatever they wanted to write, that still would be, per se, a false claim if it was submitted to Tricare. And we're talking about a scheme which had a significant magnitude. Once this scheme was enacted, sales increased 88 percent and reached up into the billions. Now, if only just a percentage of those claims were submitted falsely, then an employee in Jeff Lewis's position would reasonably believe that that would constitute a false claim. And so, based on the pleading standard, Sibley is on all fours. His awareness of these regulations, his training that he received from his company about how this triggers fraud in some or maybe all cases, he doesn't have to be a subject matter expert on that. But his training tells him that, and that's enough to give him the information he needs. My difficulty is I can see where, as a regulatory matter, AbbVie may indeed have crossed the line. But I'm having difficulty seeing how they were aiding and abetting a false claim by somebody else. That's covered in the Sibley opinion as well. Liability under the False Claims Act applies to people who deliver information to someone else who uses it to submit a false claim. So it's not limited just to the- But following up on Judge Ripple's question, even if we get to that point and there was a reasonable belief that this could have been a false claim, where are you alleging that your client said that to his employer, right? This is a retaliation claim. So if he's complaining about regulatory violations, very important, glad he's doing it, right? That's one thing. But if the claim is retaliation, where did he put the employer on notice that, I'm not just concerned about this from a regulatory perspective. I'm concerned because I think this is going to defraud the government. Those dots were connected by AbbVie when they gave the training in the first place. Now, just like the first two plaintiffs in Sibley, those employees also complained about regulatory violations. Those are regulatory violations that tend to create false claims or tend to have a nexus to false claims against the government. The third employee in Sibley just had a complaint about regulatory violations about double billing. That did not tend to have any nexus to false claims. I would like to reserve the rest of my time for a vote. If you would, with our presider's indulgence, how do we deal with our First Circuit friends? They don't seem to agree with you. I think that Sibley is controlling in this circuit, and it's a perfect road map in terms of how to evaluate the nature of these claims. At the pleading stage, was it plausible that a widespread campaign to promote off-label usage would generate at least some false claims? To Judge Ripple's point, doctors actually can explain why things are being prescribed. Under this court's decision in Dirkholtz v. FKW Inc., if the government knows why a claim is being submitted and approves it, there's no falsity. A final word about two other independent bases for dismissal. First, Mr. Lewis doesn't respond to the fact that, given what he specifically told AbbVie, AbbVie didn't know he was protesting fraud on the government. And also, Mr. Lewis has not addressed his failure to plead cognizable retaliation. Those grounds are also easy additional grounds for affirmance. For any of those reasons, we would respectfully ask this court to affirm. In reading your briefs and reading the complaint, the thing that struck me and gave me pause with respect to your position was, with respect to paragraph 6 of the complaint, is that really, what more could this fellow do at the complaint stage without any discovery? We're having this tendency now where things seem to be moving a little bit from what's acceptable at summary judgment to what's acceptable at a complaint. When I first came on this court, we were worried about what's acceptable at trial and what's acceptable on summary judgment. And now we seem to be fighting another battle of making the complaint the new summary judgment. And that really does bother me a little bit about your case. What more could these people have done without discovery? So two things, Judge Ripple, on the protected conduct element. You're what? Sorry, two things on the protected conduct element. So first, as simply shows, there would need to be allegations that these concerns Mr. Lewis was expressing related to government payment programs.